# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

1600 Amphitheater Parkway
Mountain View, California

Case No.

FILED
JUL 0 2 2015
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                         DEPUTY

## APPLICATION FOR A SEARCH WARRANT

'15 MJ 2024

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the ___Nortthern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 16 USC 3372 and 3373 | Unlawful Importation of Wildlife |
| 16 USC 1538 and 1540 | Unlawful Importation of Protected Species |
| 18 USC 545 | Importation Contrary to Law |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

NOAA Special Agent Michelle Zetwo
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/2/15

City and state: San Diego, California

*Judge's signature*

U.S. Magistrate Judge Mitchell D. Dembin
*Printed name and title*

## **ATTACHMENT A**

Google is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records and data located at 1600 Amphitheater Parkway, Mountain View, California

## ATTACHMENT B

I. <u>Service of Warrant</u>

The officer executing the warrant shall permit Google (the "ISP"), as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

II. <u>Search Protocol</u>

The ISP shall copy to electronic storage media all files, including emails, attachments, buddy list, profiles, access logs, transactional data, billing records and any other related financial, subscriber, and use records associated with

marindustriasbc@gmail.com

for the period from February 1, 2015, to the date this warrant is signed.

III. <u>Items Subject to Seizure</u>

The search of the data supplied by the ISP pursuant to this warrant shall be conducted as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant. Law enforcement shall seize data only if it involves or relates to:

a. The importation of seafood, including shark and sea cucumber, from Mexico into the United States, such as invoices, shipping documents, U.S. and foreign customs documents, records of payment, correspondence, memos, notes, facsimiles, permits, permit applications, and all attachments thereto;

b. The exportation of seafood, including shark and sea cucumber, from Mexico to the United States or China, such as invoices, shipping documents, U.S. and foreign customs documents, records of payment, correspondence, memos, notes, facsimiles, permits, permit applications, and all attachments thereto;

c. The purchase, sale, shipping, transportation, transfer and distribution of seafood, including shark and sea cucumber

d. Invoices for the sale of seafood and records related to the preparation, location and distribution of invoices for seafood

e. Payments for seafood and seafood products

f. Images of seafood, including shark and sea cucumber;

g. Contact with Customs brokers, domestic and foreign, relating to the

      importation and exportation of seafood, including shark and sea cucumber;

h.   The legal requirements for importation and exportation of seafood, including statutes, regulations, articles, brochures, and results of internet searches;

i.   The identities of any co-conspirators;

j.   Electronic mail and attachments that provide context to any electronic mail reflecting the criminal activity described in this warrant including any electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail that identifies any users of the subject account.

which constitute evidence of the illegal importation of seafood protected by CITES (including shark and sea cucumber) from Mexico into the United States and its exportation from the United States to China by Rouzaud in violation of Title 18, United States Code, Section 545 (Smuggling); Title 16, United States Code, Sections 3372 and 3373 (Unlawful Importation or Exportation of Fish and Wildlife), and Title 16, United States Code, Sections 1538 and 1540 (Illegal Importation or Exportation of a CITES Species).

# AFFIDAVIT IN SUPPORT OF
# APPLICATION FOR SEARCH WARRANT

I, Michelle Zetwo, being duly sworn, hereby depose and state as follows:

1. I am a Special Agent of the United States Department of Commerce National Oceanic and Atmospheric Administration ("NOAA"), Office of Law Enforcement, and have been so employed for approximately 16 years. I am currently assigned to the San Diego field office.

2. I have completed the basic Criminal Investigator Training Program at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia, as well as some advanced training. I have conducted numerous wildlife investigations during my employment as a Special Agent and participated in the execution of multiple search warrants relating to violations of state and federal wildlife laws.

3. This affidavit is in support of an application by the United States of America for a search warrant for the internet service provider Google, who provides electronic message service to users as Gmail, located at Google Operational Headquarters ("Google"). I seek authority to search electronically stored information at Google, the internet service provider located as described in Attachment A, regarding the following Gmail account:

   a. marindustriasbc@gmail.com

for the period from February 1, 2015 to the present, for items, more fully described in Attachment B, paragraph II, which constitute evidence, fruits, and

1

instrumentalities of violations of federal criminal law, namely, Title 16, United States Code, Section 3372 (a)(2)(A), which prohibits the importation and exportation of fish and wildlife taken in violation of foreign law; Title 16, United States Code, Section 1538, which prohibits the importation and exportation CITES species without a CITES permit; and Title 18, United States Code, Section 545, which prohibits the importation of merchandise contrary to law.

4. The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers in Mexico and the United States, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

## STATEMENT OF PROBABLE CAUSE

5. On May 21, 2015, I received a call from United States Fish and Wildlife Service ("USFWS") Wildlife Inspector ("WI") Lisa Peratino who told me she conducted an inspection of a shipment of shark fins at the Otay Mesa Commercial Port of Entry ("POE") traveling in bond from Mexico to Hong Kong. WI Peratino told me that she examined the shipment which consisted of 26 boxes of shark fins and suspected that they contained fins from hammerhead sharks. This species was listed under Appendix II in the Convention of International Trade in

2

Endangered Species of Wild Flora and Fauna ("CITES") on September 14, 2014. The shipment was not accompanied by a CITES certificate, which is required for import, export, or re-export of any CITES species. The commercial invoice that accompanied the shipment described the product as "dried shark fin."

6. WI Peratino said she sent 12 shark fins to the USFWS Forensics lab for DNA analyses and the shipment was being detained by U.S. Customs and Border Protection ("CBP"). According to the Mexican commercial invoice, the shipment contains 432 kg (950 pounds) of shark fins valued at $4,320. Based on my experience and training, shippers will list a lower weight and possibly a lower value on seafood products destined for China in order to avoid the payment of duty in China.

7. On May 26, 2015, WI Peratino and I weighed each box of shark fins and numbered the outside of each of the 26 boxes with a marker. The total weight of the fins was 490.79 kg (1,082 pounds). This is 58.79 kg (129 pounds) more than the amount of shark fins listed on the Mexican commercial invoice.

8. While we were weighing the shark fins, I spoke with Ishmael Romo, Federal Express ("FedEx") broker who was standing by as we weighed the fins. Romo stated that the owner of the fins was Jorge Rouzaud, who works for Mar Industrias in Mexico. Romo advised that he communicated with Rouzaud by phone and email. Romo said that Rousaud's email address is marindustriasbc@gmail.com.

Romo said the fins were going to another FedEx facility in San Diego and then to Memphis (a hub for FedEx) where the fins would be shipped to Hong Kong.

9. That same day, Rouzaud called my cell phone and I asked Homeland Security Investigations ("HSI") SA Elizabeth Cervantes to assist with translating this conversation from Spanish to English. Rouzaud told SA Cervantes that he works for Mar Industrias in Baja California and he processes seafood products in Ensenada, Mexico. He said Enrique Real Montijo hired him to export the product since Rouzaud has an FDA permit. Rouzaud told SA Cervantes he has imported shark fins in the past and is aware of the requirements. SA Cervantes asked Rouzaud for copies of the Guia de Pesca for the product and for the scientific names of the species being exported. Rouzaud agreed to email her the documents. A Guia de Pesca is a document similar to a waybill that is required under Mexican law to transport fisheries products from one area of Mexico to another.

10. On May 27, 2015, SA Cervantes forwarded me an email Rouzaud sent her from his email address marindustriasbc@gmail.com. The email included two Guia de Pescas. One of the two Guia de Pesca, dated February 23, 2015, listed 6 kg of "cornuda." The CITES Internet website lists "cornuda" as a Spanish term for hammerhead shark. In addition to "cornuda," the Guia de Pesca listed tiburon mako, tiburon piloto, tiburon Zorro and tiburon Azul.

11. Rouzaud's email also contained two scientific names and two Spanish terms next to them: *Carcharhinus falciformis*/tiburon piloto and *Isurus*

4

*Oxyrinchus*/tiburon mako. Based on my review of shark biology reference books, *Carcharhinus falciformis* is the scientific name for silky shark, and *Isurus Oxyrinchus* is the scientific name for mako shark. WI Peratino advised me that "tiburon piloto" is the Spanish term for silky shark, while "tiburon Mako" is the Spanish term for mako shark.

12. The Hong Kong business name and address for the destination of the fins provided by Rouzaud in his email to SA Cervantes was Han Wa Birds Nest Ltd. G/F 188 Wing Lok Street Sheung Wan Hong Kong. In the original import documents, the final destination for the shark fins was listed as Mr. Cai, Global Wealthy Trading Co, GF 23 Chiu Kwog Street, Sai Ying Pun Hong Kong.

13. On May 28, 2015, I forwarded the two Guia de Pesca to Alejandro Zapata Lozano of CONAPESCA, the Mexican fisheries agency, for review. I had previously sent him the commercial invoice that had accompanied the shipment at importation. On June 11, 2015, he confirmed that the shipment was illegal under Mexican law. He stated that a cooperative with a valid shark fishery permit in Mexico had made two sales to Enrique Real Montijo, 332 kg and 350 kgs of shark fin of various species on February 23 and April 30, 2015, respectively. The fins were transported by Montijo with valid Guia de Pesca. The invoices and Guia de Pesca provided by Zapata Lozano matched the invoices and Guia de Pesca provided by Rouzaud. Zapata Lozano stated that his staff had interviewed Montijo, who

5

stated that he had sold dried shark fin to Jorge Rouzaud but did not provide an invoice to Rouzaud because Rouzaud did not pay him.

14. On May 29, 2015, I was advised by WI Peratino that she had received verbal results from the FWS forensic lab that all twelve fins she sent for DNA testing are of the smooth hammerhead shark species, which are listed on Appendix II of CITES.

15. The contents of the 26 boxes of shark fins were physically examined by Kathy Moore and Dr. Jenny Giles of the NOAA forensic laboratory on June 4-5, 2015. They took samples of the fins for further DNA analysis. At the conclusion of the examination, I was advised by Dr. Giles that based on her preliminary examination, she suspected that the boxes contained many species which could not be legally exported under CITES without CITES documentation.

16. On June 5, 2015, SA Cervantes and I interviewed Rouzaud at the Otay Mesa Port of Entry. Rouzard stated that he was aware that there are restrictions in California regarding shark fins, and that he consulted with the FedEx broker and U.S. Customs before he imported the fins. Rouzaud explained that he had sent a "pilot shipment" of seven boxes of shark fins in early May to make sure they would pass through Customs, which they did. Rouzaud stated that the sharks were caught in Magdalena Bay and the fishermen who caught the sharks told him the species names which were in his shipment. Rouzaud said the fishermen caught the sharks, sold them to Enrique, who sold them to him. Rouzard stated that he communicated

with Enrique primarily by phone and also by email. Rouzaud stated that he didn't believe he needed permits to export the shark fins. He claimed that he was unable to identify the species of the sharks based on the fins, and relied on the information he received from Enrique.

17. Rouzaud stated that he was aware of CITES and CITES permits because he knew that the species of sea cucumber known as *fuscus* required a CITES permit to export. Rouzaud advised that he did not contact CONAPESCA to notify them of the export, and that the shipment was not inspected by Mexican authorities. I told Rouzaud that his shipment of shark fins contained a large amount of hammerhead species which requires a CITES permit. Rouzaud said he didn't know this.

18. On June 12, 2015, I sent a preservation letter to Google, requesting preservation of the emails for marindustriasbc@gmail.com.

19. The Lacey Act, Title 16, United States Code, Section 3372(2)(A), prohibits the importation of wildlife that was taken or possessed in violation of foreign law. Section 3373(d) of Title 16 provides criminal penalties for persons who knowingly import fish or wildlife taken in violation of foreign law, if they knew or in the exercise of due care should have known that the fish or wildlife was taken in violation of foreign law. The Endangered Species Act, Title 16, United States Code, Section 1538(c)(1) prohibits any person subject to the jurisdiction of the United States from engaging in trade in specimens contrary to the provisions of CITES or possessing specimens traded contrary to the provisions of CITES. Section

7

1540 of Title 16 provides criminal penalties for a knowing violation of Section 1538. Section 23.27 of Title 50 of the Code of Federal Regulations requires that a CITES certificate of origin be provided for import, export or re-export of any CITES species.

20. Based on the foregoing, I have probable cause to believe that Rouzaud violated the Lacey Act by knowingly importing fish exported and sold in violation of the laws of Mexico, and in the exercise of due care should have known that the fish was exported and sold in violation of Mexican law, in violation of Title 16, United States Code, Sections 3372(a)(2)(A) and 3373(d); and violated the Endangered Species Act by knowingly traded in and possessed a specimen traded contrary to the provision of CITES, in violation of Title 16, United States Code, Sections 1538(c)(1) and 15409B)(1); and knowingly imported merchandise contrary to law, that is, the Lacey Act and the Endangered Species Act, in violation of Title 18, United States Code, Section 545. I further have probable cause to believe that evidence of such offenses will be found in the email account marindustriasbc@gmail.com.

## GENUINE RISKS OF DESTRUCTION OF EVIDENCE

21. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In

1  this case, only if the subject receives advance warning of the execution of this
2  warrant, will there be a genuine risk of destruction of evidence.

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

22. The United States served a warrant on Google for this information on June 15, 2015. On July 1, 2015, Google responded and advised that due to the wording of the warrant, which appeared to require Google to conduct the search, rather than law enforcement, Google would be unable to provide responsive records.

### Google

23. Google is an Internet based communications provider that offers a variety of services to the public, including electronic message service as gmail.com.

### Procedures for Electronically Stored Information

24. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Google are not. It would be inappropriate and impractical for federal agents to search the computer network of Google for the relevant accounts and then to analyze the contents of those accounts on the premises of Google. The impact on Google's business would be severe.

25. Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs and any other content from the Google accounts, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of

interference with the business activities of Google, to protect the rights of the subject of the investigation and to effectively pursue this investigation, authority is sought to allow Google to make a digital copy of the entire contents of the account subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be forensically imaged and the image will then be analyzed to identify communications and other data subject to seizure pursuant to Attachment B. Relevant data will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

26. Analyzing the data to be provided by Google may require special technical skills, equipment and software. It also can be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. The data is saved in a proprietary non text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.

27. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data

analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

28. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

29. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

//
//
//
//
//
//
//
//

## CONCLUSION

30. Based on the foregoing, there is probable cause to believe the items identified in Attachment B have been used in the commission of a crime and constitute evidence, fruits, and instrumentalities of violations of Title 16, United States Code, §§ 1538(a)(1)(A), 1540(b), 3372(a)(2)(A), and 3373(d); and Title 18, United States Code, Section 545, and will be found on the at the premises to be searched as provided in Attachment A.

_____
MICHELLE ZETWO, Special Agent
National Oceanic and Atmospheric
Administration, Office of Law Enforcement

Subscribed and sworn to before me this ___ day of July 2015.

_____
HON. MITCHELL D. DEMBIN
UNITED STATES MAGISTRATE JUDGE